UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAD DELPHINE ALFRED
DUNCAN FOUNDATION FOR THE
DEAF AND HARD OF HEARING
et al.,

      Plaintiffs,

v.

DELAWARE NORTH COMPANIES
INC. et al.,

      Defendants.

Case No. 24-12650
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS [16]**

---

Like most ballparks in America, Comerica Park, home to the Detroit Tigers, relies on concession stands to provide fans their "peanuts and cracker jack." Comerica Park also relies on unpaid volunteers to staff these stands. Delaware Sportservice Inc.—the company contracted to operate Comerica Park's concession stands—partners with nonprofit organizations to provide the volunteers. In turn, Delaware Sportservice makes charitable donations to the nonprofits that facilitated this connection. Plaintiff DAD Delphine Alfred Duncan Foundation for the Deaf and Hard of Hearing ("DAD Foundation") is one such nonprofit.

On June 20, 2023, volunteers from DAD Foundation staffed a concession stand during a Tigers home game. Delaware Sportservice was aware that these volunteers were deaf or hard of hearing but provided no accommodations (like signage or

interpreters) to help them communicate with customers. So when a "secret shopper," sent by Delaware Sportservice, approached a DAD volunteer and attempted to buy concessions, the pair struggled to communicate. Frustration ensued, and both secret shopper and volunteer had a negative experience. Shortly thereafter, Delaware Sportservice discharged all of DAD's deaf volunteers from their positions and banned DAD Foundation from further participation in the nonprofit organization program.

Plaintiffs—DAD Foundation and four of its members who volunteered on June 20, 2023—filed this lawsuit alleging violations of Title III of the Americans with Disabilities Act of 1990, *see* 42 U.S.C. §§ 12181–12189, as well as Michigan's Persons with Disabilities Civil Rights Act, *see* Mich. Comp. Laws §§ 37.1101–37.1607. (ECF No. 1.) They assert that Delaware Sportservice unlawfully discriminated against them because of their disabilities by "den[ying] them a fair opportunity to participate in [the] nonprofit organization program at Comerica [P]ark." (*Id.* at PageID.11–12; *see id.* at PageID.13.) Defendants respond that DAD Foundation's claim is essentially a mislabeled employment dispute not cognizable under Title III of the ADA. (*See* ECF No. 16, PageID.97–101.)  As such, it moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

For the reasons that follow, the Court finds that Plaintiffs' allegations state a plausible claim under the ADA and PWDCRA and DENIES Defendants' motion to dismiss.

# I.

Because this is a motion to dismiss, the Court recites the facts as they are alleged in the complaint. *See Savel v. MetroHealth Sys.*, 96 F.4th 932, 937 (6th Cir. 2024).

Defendants—Delaware North Companies Incorporated, Delaware North Companies Sportservice, Inc., Detroit Sportservice, Inc., Detroit District Sportservice, Inc., Sportservice Food Service, Inc., Detroit Hospitality Sportservice, Inc., and Woodward Sportservice, Inc. (collectively "Delaware Sportservice")—own, manage, and operate food and beverage concessions at sports stadiums and arenas across the country, including Comerica Park in Detroit, Michigan. (ECF No. 1, PageID.6.) In lieu of hiring employees to operate Comerica Park's concession stands, Delaware Sportservice instituted a "nonprofit organization program," which invites nonprofits to provide unpaid volunteers in exchange for a donation from Delaware Sportservice to the nonprofit. (*Id.* at PageID.7.)[1]

DAD Foundation partnered with Delaware Sportservice as part of the program at the beginning of the 2023 Major League Baseball season. (*Id.*) Before beginning their work as unpaid volunteers, members of the DAD Foundation completed a series of volunteer trainings facilitated by Delaware Sportservice to prepare for their roles. (*Id.*) Even though Delaware Sportservice knew the volunteers were deaf and hard of hearing, it did not provide sign language interpreters or any other accommodations

---

[1] According to Plaintiffs, these creative volunteer arrangements have emerged as the dominant model for staffing concession stands at sports venues around the country. (ECF No. 18-1, PageID.130 n.1.)

3

to assist the volunteers during their training. (*Id*. at PageID.8.) Nor did Delaware Sportservice provide any accommodations, such as "signage to inform customers how to order and communicate with the volunteers," or supervisors "trained in communicating with the deaf and hard of hearing," when the volunteers began working at the concession stands in spring 2023. (*Id*.)

On or around June 20, 2023, Defendants sent a secret shopper to visit a concession stand staffed by DAD Foundation volunteers. (*Id*. at PageID.9.) The secret shopper "treated the volunteers as though they had no hearing impairment whatsoever and refused to accommodate their conditions when ordering, asking questions, paying, and otherwise communicating with the volunteers." (*Id*.) "As a result, [there was] signification miscommunication" resulting in an "emotional exchange[]" between the shopper and DAD Foundation volunteers. (*Id*.) And "[a]s a result of the exchange," Delaware Sportservice discharged the individual volunteers from their positions and banned DAD Foundation from participating in the nonprofit organization program in the future. (*Id*.)

In October 2024, Plaintiffs filed this lawsuit, alleging two counts of disability discrimination under Title III of the ADA and § 37.1301 of Michigan's PWDCRA. (*Id*. at PageID.10, 12.) In response, Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs fail to state a claim because they do not allege that deaf volunteers were denied access to the "goods and services" Defendant offers—namely, food and drink. (ECF No. 16, PageID.11, 15–16.)

4

The motion is fully briefed and does not require further argument. *See* E.D. Mich. LR 7.1(f).

## II.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "This standard does not require 'detailed factual allegations.'" *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012) (citation omitted). But the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint may raise novel interpretations of law, so long as it contains allegations sufficient to sustain recovery "under some viable legal theory." *See Han v. Univ. of Dayton*, 541 F. App'x 622, 625–26 (6th Cir. 2013) (citing *Twombly*, 550 U.S. at 562).

In assessing whether a plaintiff has met this burden, the Court accepts as true the plaintiff's well-pleaded factual allegations and draws all reasonable inferences in the light most favorable to the plaintiff. *See Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012)*; see also Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562–63 (6th Cir. 2011).

To state a *prima facie* claim of discrimination under Title III of the ADA, a plaintiff must allege that (1) he or she is disabled within the meaning of the ADA; (2) the defendant owns, leases, or operates a place of public accommodation; and (3) the

5

defendant discriminated against the plaintiff by denying them "a full and fair opportunity to enjoy the services defendants provide." *La Riccia v. Cleveland Clinic Found.*, No.21-3990, 2022 U.S. App. LEXIS 142, at *3–4 (6th Cir. Jan. 4, 2022); *see also* 42 U.S.C. § 12182(a). "A claimant need not, however, allege facts establishing a prima facie case of disability discrimination to survive a motion to dismiss under Rule 12(b)(6)." *Morgan v. St. Francis Hosp.*, No. 19-5162, 2019 WL 5432041, at *1 (6th Cir. Oct. 3, 2019) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-511 (2002)); *see also Mustafa v. Ford Moto Co.*, No. 2401763, slip op. at 7, 12 (6th Cir. Sept. 24, 2025), https://www.opn.ca6.uscourts.gov/opinions.pdf/25a0434n-06.pdf   (considering   the plaintiffs' pleaded facts under the *McDonnell Douglas* framework to determine whether he satisfied his less burdensome pleading requirements). The Sixth Circuit has held that Michigan's PWDCRA largely mirrors Title III, such that resolution of a Title III claim "will generally . . . resolve the plaintiff's PWDCRA claim." *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2013).

Here, no one disputes that Plaintiffs have a qualifying disability. (ECF. No 1, PageID.10; *see generally* ECF No. 16.) Nor do the parties dispute that Comerica Park's concession stands are public accommodations, leased and operated by Delaware Sportservice. (ECF. No 1, PageID.10; *see generally* ECF No. 16.) Rather, the crux of their dispute is the third element: whether Plaintiffs, as volunteers at these concession stands, not patrons of them, may raise a plausible claim of disability discrimination under Title III of the ADA. (*See* ECF No. 18-1, PageID.144.)

## III.

"Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). To effectuate its sweeping purpose, the ADA forbids disability discrimination in major areas of public life, including employment (Title I), public services (Title II), and public accommodations (Title III). *Id.* at 675. Plaintiffs' claim in the instant case is asserted under Title III, which provides that:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).[2]

The ADA defines "public accommodation" in terms of twelve broad categories of facilities that are leased or operated by private entities. 42 U.S.C. § 12181(7). Relevant here, this includes "a restaurant, bar, or other establishment serving food or drink" and "stadium or other place of exhibition or entertainment." *Id.* at § 12181(7)(B)–(C). These categories are to be construed liberally to afford people with disabilities equal access to the wide variety of establishments available to the non-disabled. *PGA Tour*, 532 U.S at 666–67. But the Sixth Circuit has narrowed this

---

[2] The PWDCRA likewise prohibits "[d]enying an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation or public service because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids." Mich. Comp. Laws § 37.1302(a).

analysis somewhat in holding that public accommodation must be a "physical place." *See Lenox v. Healthwise of Ky., Ltd.*, 149 F.3d 453, 456–57 (6th Cir. 1998) (citing *Parker v. Metro. Life Ins.*, 121 F.3d 1006, 1010–12 (6th Cir. 1997) (*en banc*)).

## A. Is Plaintiffs' Complaint Fairly Construed as an "Employment Dispute" Beyond the Scope of Title III of the ADA?

At the outset, Defendants contend that Plaintiffs' complaint, styled as a Title III public accommodations suit, is more properly construed as an employment discrimination claim under Title I. And, continue Defendants, since Title III cannot be used to resolve "employment disputes," both Title III and the PWDCRA are inapplicable to Plaintiffs' claims as a matter of law. (ECF No. 16, PageID.95–101.)

While the Supreme Court has yet to resolve the issue, *see PGA Tour*, 532 U.S at 679, the Sixth Circuit has held that "the statutory framework of the ADA expressly limits discrimination in employment practices to Title I of the ADA," *Parker*, 121 F.3d at 1015. Thus, claims of disability discrimination in the context of employment are exclusively the province of Title I—not Title III. But that is not fatal to Plaintiffs' claims here, because Plaintiffs' complaint does not raise an employment dispute.

Indeed, Plaintiffs do not allege that they were employed by Delaware Sportservice. (ECF. No. 1; ECF No. 18-1, PageID.138); *Christ v. Univ. of Findlay*, No. 17-00713, 2018 WL 4184339, at *12 (S.D. Ohio Aug. 31, 2018) (considering that the plaintiff "never aver[red] that she was [defendant's] employee" when assessing if an employee-employer relationship existed). Nor do Defendants. (ECF No. 16, PageID.101 n.2 ("Defendants do not argue or suggest that an employment relationship existed between any Plaintiff in this case and any of Defendants.").)

8

Moreover, Plaintiffs' claims of injury do not sound in the traditional terms of employment discrimination. The complaint does not allege that Plaintiffs were denied desired employment with Delaware Sportservice because of their disabilities. (ECF No. 1); *see, e.g., Pemberton v. Bell's Brewery, Inc.*, No. 24-1518, 2025 U.S. App. LEXIS 22863, at *9–10, *29-35 (6th Cir. Sept. 4, 2025) (analyzing a Title I claim that, among other things, claimed plaintiff was denied promotions because of his disability). Nor do Plaintiffs complain of unequal benefits in the context of employment. *See, e.g., Parker*, 121 F.3d at 1015 ("[D]iscrimination in the provision of fringe benefits during employment is governed strictly by Title I . . . ."). Rather, Plaintiffs' complaint alleges only that they were unpaid volunteers, outside the scope of Title I, who were denied a volunteer opportunity—not an employment benefit. (ECF No. 1, PageID.13; ECF No. 18-1, PageID.145.)

In sum, to the extent Defendants ask this Court to read Plaintiffs' complaint as *implicitly* raising an employment discrimination claim, despite the absence of any allegations to that effect, this Court declines to do so. At this stage, the Court must construe the facts in the light most favorable to the Plaintiff. Therefore, the Court will not treat Plaintiffs' stated public accommodations claim as an "employment dispute."

## B. Is Title III's Protection Limited to the "Clients and Customers" of a Public Accommodation?

Next, Defendants contend that Title III's protections are limited to only the "clients and customers" of a public accommodation, not their workers or volunteers. (ECF No. 16, PageID.94–95.) Thus, according to Defendants, Plaintiffs cannot seek

the protection of Title III because they are not "clients and customers" who were denied the food and drink Defendants' concession stands offer. (*Id.*) Plaintiffs respond that no such limitation on Title III's application exists, but even if it did, DAD Foundation and its volunteers are, in effect, "customers" of Delaware Sportservice's nonprofit organization program. (ECF No. 18-1, PageID.135.)

Plaintiffs are correct that the Supreme Court has yet to hold that Title III is limited to the "clients and customers" of a public accommodation. *PGA Tour*, 532 U.S at 679–80. Neither has the Sixth Circuit. *Harmon v. Waterman*, No. 24-5773, 2025 WL 2434374, at *5–6 (6th Cir. June 6, 2025). Nevertheless, some district courts (all outside this jurisdiction) have embraced Defendants' constrained reading of Title III. *See, e.g.*, *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 394 F. Supp. 2d 1134, 1144 (W.D.S.D. 2005), *vacated as moot*, 450 F.3d 338 (8th Cir. 2006).

One such case, relied on heavily by Defendants (ECF No.16, PageID.97–100), is *Bauer v. Muscular Dystrophy Ass'n*, 268 F. Supp. 2d 1281, 1291–92 (D. Kan. 2023) ("Title III is most reasonably construed to mean the goods, services and facilities offered to customers or patrons of the public accommodation, not to individuals who work at the facility, whether those workers be paid employees, independent contractors, or unpaid volunteers"), *aff'd on other grounds*, 427 F.3d 1325 (10th Cir. 2005). But the Tenth Circuit, on review of the case, expressly declined to reach the issue, finding that the Plaintiffs failed to prove discrimination and skipping the question of whether Title III applied to volunteers. *Bauer v. Muscular Dystrophy Ass'n*, 427 F.3d 1326, 1330 (10th Cir. 2005).

And *Bauer* is distinguishable on the facts. At issue there was the volunteer policy used by a summer camp for children with muscular dystrophy. *Bauer*, 268 F. Supp. 2d at 1282. To find suitable volunteers, the camp employed an "extensive application" process, which included, among other things, that applicants provide references, pass a criminal background check, and undergo a mandatory "medical health examination." *Id.* at 1285. Moreover, the camp expressly confined volunteer eligibility to individuals "at least 16 years of age and 'of sufficient size and strength' to assist with the needs of campers,'" including an ability to "lift and care for" disabled campers. *Id.* The plaintiffs, two disabled individuals who did not meet these criteria, claimed the camp's strength and size requirements for volunteers discriminated based on disability by denying them equal access to a "privilege" offered to the general public by the camp: the volunteer opportunity. *Id.* at 1287, 1290. The district court—whose reasoning, again, was not addressed or adopted by the Tenth Circuit—rejected that argument, concluding that Title III only covered the "goods, services, and facilities *offered to customers or patrons of the public accommodation,*" and that Plaintiffs, as rejected volunteers, could not be considered "customers or patrons" of the camp. *Id.* at 1291, 1293.

Based on the limited factual allegations before this Court at the motion to dismiss stage—which must be taken as true—the volunteer program here appears to be of a different nature. Plaintiffs allege that the nonprofit organization program had no comparable prerequisites to entry or strict eligibility criteria and was open to "any non-profit organization and any members of the public [who create] a nonprofit

11

organization." (ECF No. 18-1, PageID.135.)[3] Thus, even under the logic of *Bauer*, Plaintiffs have a colorable argument that Delaware Sportservices' nonprofit organization program is, in fact, a "privilege" open to the public, where the plaintiffs there did not.

*Bauer* aside, the apparent weight of authority has rejected the theory that Title III is limited in application to only "clients and customers" of a public accommodation. *See, e.g.*, *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 732–33 (9th. Cir. 2007); *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d. 113, 118–19 (3rd Cir. 1998); *Robinson v. CareAlliance Health Servs.*, No. 13-01916, 2014 WL 4402684, at *5 (D.S.C. Sept. 4, 2014); *Jensen v. United First Fin.*, No. 09-00543, 2009 WL 5066683, at *7 (D. Utah Dec. 15, 2009); *Badri v. Huron Hosp.*, No. 08-01913, 2009 WL 10689494, at *3 (N.D. Ohio June 15, 2009); *Hetz v. Aurora Med. Ctr. of Manitowoc Cnty.*, No. 06-636, 2007 U.S. Dist. LEXIS 44115, at *29 (E.D. Wis. June 18, 2007).

And while the Supreme Court has yet to expressly rule on the issue, its opinion in *PGA Tour* lends support to a broader reading of Title III. The argument that only "clients and customers" of public accommodations are entitled to Title III protection finds purchase in the text of a specific subsection of the statute: § 12182(b)(1)(A), which defines covered "individuals" for the purposes of certain subsections of the law

---

[3] Defendants contest this characterization of the program, noting that service at concessions stands was limited to only those volunteers who completed "volunteer training." (ECF No. 19, PageID.158–59.) But this distinction looks at the wrong point in time: Plaintiffs allege that the opportunity to enroll as a volunteer (and thus later participate in any required volunteer training) is, in the first instance, available to the public. (ECF No. 18-1, PageID.135.)

as "clients and customers." 42 U.S.C. § 12182(b)(1)(A).[4] But the Supreme Court considered this text in *PGA Tour* and explained that this language "is not literally applicable to Title III's general rule prohibiting discrimination against disabled individuals" and is, by its own terms, limited to "subparagraphs b(1)(A)(i)-(iii)." 532 U.S at 679.

Ultimately, the Court in *PGA Tour* found it unnecessary to decide whether Title III is limited to only "clients and customers" because it could appropriately characterize the plaintiff there as a "client" or "customer" of the PGA. *Id.* at 679–80. The Court held that a disabled golfer on the PGA Tour, seeking an accommodation to use of a golf cart during competition, was a "client or customer" of the Tour, reasoning that because golfers paid an entry fee for a "chance to compete" in the qualifying school and subsequent tour events, they were essentially "customers" of the PGA. *Id.* at 678–79.

This Court also finds a protracted analysis of Title III's various subdivisions unnecessary at this time, because Plaintiffs have raised a viable argument that they were "clients [or] customers" of the nonprofit organization program. *See also*

---

[4] Section 12182(b)(1)(A) contains, in relevant part, three subsections that enumerate three prohibited forms of disability discrimination: (i) denying individuals participation in the goods, services, privileges, etc. of a public accommodation, based on disability; (ii) providing individuals "unequal benefits" because of their disability; and (iii) providing "separate" benefits to persons with disabilities, absent necessity. Subsection § b(1)(A)(iv) then reads: "*For purposes of clauses* (i) through (iii) of this subparagraph, the term 'individual or class of individuals' refers to the *clients or customers* of the covered public accommodation that enters into the contractual, licensing or other arrangement." (emphasis added).

*Robinson*, 2014 WL 4402684, at *11 (declining to rule on whether Title III applies to only "clients and customers" at the motion to dismiss stage).

For now, it is sufficient to say that if a golfer is a "client or customer" of the PGA Tour by virtue of accepting the offered "chance" to compete, this Court sees no clear reason why Plaintiffs, who had accepted Delaware Sportservice's "opportunity" to volunteer, would not be "clients and customers," too. Consider the parallels. The traditional patrons of a concession stand (consumers seeking food and drink) may be likened to the spectators of a PGA Tour event. Both parties come to the public accommodation to *receive* a good or service: the golf spectators, entertainment; the concessions patrons, receipt of food and drink. Both the golf spectator there, and the concessions customer here, are more easily thought of as the traditional "clients and customers" of a public accommodation.

But the Court in *PGA Tour* found that the golfers not only provided a "service" to PGA spectators, but they also *received* a service from the Tour—a chance to compete—making them "clients or customers" of the Tour as well as participants in it. 532 U.S at 680. So even if Defendants are right that the volunteers here primarily *provide* the "goods services, [or] privileges" of their public accommodation, and thus cannot (or should not) also be considered "clients and customers," of that public accommodation, the Supreme Court did just that in *PGA Tour*.

Moreover, one might consider the volunteer opportunity that Delaware Sportservice offers a "service" of which its volunteers are the "clients or customers." Volunteers not only confer benefits on the recipients of their charitable work, but

receive benefits themselves: volunteer hours that might be used to satisfy certain school requirements, work experience in a low-stakes environment, camaraderie with fellow volunteers, not to mention the personal fulfillment one might feel after rendering charitable services. Indeed, these non-economic benefits of participation in public life were expressly contemplated by Congress in promulgating the ADA. H.R. Rep. No. 101-485(II), at 99 (1990) ("The purpose of the ADA is to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities and to bring persons with disabilities into the economic and *social mainstream* of American life." (emphasis added)).

Absent guiding precedent on this issue of interpretation, or cases with more factually analogous circumstances, this Court must draw analogies between *PGA Tour* and the instant case, setting obvious distinctions aside. The legal theory Plaintiffs have presented is viable under *PGA Tour* and thus sufficient to allow this case to proceed to discovery.

## C. Is Defendants' Nonprofit Giving Program a "good, service [or] privilege" of its Concession Stands?

Regardless of whether Title III is limited to "clients and customers" of a public accommodation, and whether Plaintiffs can nonetheless be considered "clients and customers" of the public accommodation, the Court must still determine whether the volunteer program offered by Delaware Sportservice is among the "privileges" it offers to the public. Put differently, before Plaintiffs can claim they were denied the "full and equal enjoyment" of a public accommodation and all its "goods, services, facilities, privileges, advantages, or accommodations," this Court must determine if

15

the volunteer program at issue falls within this list. Plaintiffs say it does. Defendants say not, arguing the only "goods or services" its concession stands provide are food and drink items. (ECF No. 16, PageID.104.)

Here too the Court is confronted with sparse case law and limited guidance. Some district courts have confronted the challenge of defining a "privilege" of a public accommodation in similarly unusual contexts. One court has held that a publicly available website is a "privilege" offered by brick-and-mortar credit union. *Carroll v. Fed. Fin. Credit Union*, 324 F. Supp. 3d 658, 665 (E.D. Va. 2018). Another held that the book reviews published by a newspaper are not "services" afforded to every author. *Treanor v. Wash. Post Co.*, 826 F. Supp. 568, 569 (D.D.C. 1993). Defendants rely on *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1300 (M.D. Ala. 2019), *aff'd,* in 6 F.4th 1247 (11th Cir. 2021), a case under Title II of the Civil Rights Act, which held that participation in AmazonSmile, a charitable program whereby Amazon shares the proceeds from certain sales with partner nonprofits, was not a "privilege" of the company's public website.[5] *Id.* at 1299. Each case is too distinguishable to be of much guidance here.

In the absence of relevant precedent, the Court begins where the Sixth Circuit always does when interpreting Title III of the ADA—the statute's text. *Parker*, 121 F.3d at 1010. Title III protects individuals' access to more than just "goods and

---

[5] When affirming this decision, the Eleventh Circuit did not reach the question of whether participation in a charitable program is a "privilege" of a public accommodation under Title II of the Civil Rights Act. *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1254–1256 (11th Cir. 2021).

services" available for purchase. Again, it provides that persons with disabilities are entitled to the "full and equal enjoyment of the goods, services, *facilities, privileges, advantages, or accommodations* of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added).

Defendants' reading of the statute would have the Court treat this expansive list of distinct "benefits" offered by public accommodations as mere surplusage of the phrase "goods or services." This the Court cannot do. *See, e.g.*, *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, No. 25-1235, 2025 U.S. App. LEXIS 19475, at *8 (6th Cir. Aug. 1, 2025) (citing *Kungys v. United States*, 485 U.S. 759, 778 (1988) (plurality opinion)) (noting that a "cardinal rule" of statutory interpretation is to avoid a reading that would render text "entirely redundant"); *see Memmer v. United Wholesale Mortg., LLC,* 135 F.4th 398, 407 (6th Cir. 2025) ("Because Congress used the disjunctive "or," we infer that Congress meant to differentiate, and we must see if separate meaning can fairly be given to each word.").

It might be that this broad list is only meant to protect the various benefits paradigmatically associated with each of the diverse public accommodations enumerated in the statute, but not to stretch these terms to apply in every case—i.e., that the list is intended to protect equal access to the "facilities" provided by a convention center, *see* § 12181(7)(C), and the "goods" offered by a clothing store, *see* § 12181(7)(E), but it is not meant to characterize all convention center space as a "good," nor deem the stock room at a retail store a publicly available "facility."

17

But absent authority clearly interpreting the meaning of this text, and the plausibility that the nonprofit organization volunteer program could be a "privilege" or "advantage" of the concession stands that Delaware Sportservices held out to the public, the Court declines to read § 12182(a) so narrowly.

The Court again finds some guidance in the Supreme Court's *PGA Tour* opinion that suggests the term "privileges," as it appears in § 12182(a), has a distinct meaning. There, the Court's analysis was not confined to consideration of the sort of "goods and services" the PGA Tour most obviously offers the public, like tickets to attend and watch a tournament. *PGA Tour*, 532 U.S at 677. Instead, the Court undertook a fact-specific analysis to consider, in the case before it, whether the opportunity to compete was among the benefits the Tour offered to the public, and concluded that it was. *Id.* at 680 ("[P]etitioner's tournaments . . . simultaneously offer at least two 'privileges' to the public—that of watching the golf competition and that of competing in it. Although the latter is more difficult and expensive to obtain than the former, it is nonetheless a privilege that petitioner makes available to members of the general public."). Most Americans would not deem the opportunity to compete on the PGA Tour a "privilege" freely available to them. Thus, in recognizing such a "privilege," the Court implied, contrary to Defendants' position here, that Title III's protection is not limited to only those "goods and services" a public accommodation is traditionally thought to offer.

Here, the privileges and advantages offered to the public by Delaware Sportservice's concession stands are unique by Defendants' own design. In addition

to the expected fare of hot dogs and drinks, Delaware Sportservices' concession stands in Comerica Park offer the added benefit of volunteer opportunities and a chance to secure donations for a nonprofit one is affiliated with.

Thus, taking Plaintiffs' allegation that any member of the public can volunteer as true, Plaintiffs can fairly characterize the Defendants' nonprofit organization program as a "privilege" of their public accommodation.

### D. Were Plaintiffs Denied "Full and Equal" Enjoyment of The Privileges Offered by Defendants' Concession Stands?

Finally, a *prima facie* claim under Title III requires a showing that the plaintiff was denied a "full and fair opportunity" to enjoy the privileges the defendant public accommodation offers. *See Powell v. Columbus Med. Enters., LLC*, No. 21-3351, 2021 WL 8053886, at *4 (6th Cir. Dec. 13, 2021) (citing *Camarillo v. Carrols Corp.,* 518 F.3d 153, 156 (2d Cir. 2008)). Here, Plaintiffs must allege that Delaware Sportservice either failed to accommodate them in a way that denied them the "full and equal enjoyment" of the goods, services, privileges, and so on that Defendants offer; or, discriminated against them *because of* their disabilities. *La Riccia*, 2022 U.S. App. LEXIS 142, at *4.

Plaintiffs allege discrimination under both theories. (ECF No. 1, PageID.11–13.) Accepting the factual allegations in the complaint as true, Plaintiffs have presented a plausible claim that they were denied reasonable accommodations necessary to participate in the nonprofit organization program. They completed Delaware Sportservice's required volunteer training. (ECF No. 1, PageID.7.) Upon beginning their volunteer positions, Plaintiffs were denied any accommodations, like

signage notifying customers how to order from them or sign language interpreters. (*Id.* at PageID.8–9.) As a result, Plaintiffs struggled to perform their volunteer duties and consequently were removed from the program. (*Id.* at PageID.9.)

The facts as alleged also make out a claim that DAD Foundation was removed from the nonprofit organization program because its members have disabilities. Delaware Sportservice invited DAD Foundation to participate in the nonprofit organization program. (*Id.* at PageID.7.) After failing to provide accommodations to the deaf volunteers DAD Foundation provided, Delaware Sportservice banned the Foundation from future participation. (*Id.* at PageID.9.) The Court may plausibly infer that this was an effort to prevent other deaf volunteers from causing such complications in the future. (*Id.*) These facts permit the inference that Plaintiffs were denied access to the nonprofit organization program *because* they are deaf and/or hard of hearing.

In sum, Plaintiffs have alleged facts sufficient to state a plausible claim of disability discrimination under Title III.

## IV.

One final note. This case presents challenging issues of law that this Circuit's precedents (and others) offer little guidance on. Colorable arguments can, and have been, made on both sides of the issues analyzed above. Given the limited information available at the pleading stage, the Court finds it will be better situated to grapple with these questions on a more developed factual record.

This opinion should not be read as this Court's final pronouncement on the interpretive issues before it but rather a preliminary analysis to assess whether Plaintiffs have stated a plausible claim for relief under Title III of the ADA and the PWDCRA. The Court finds that they have.

## V.

Because the Plaintiffs have presented a facially plausible argument (1) that concession stands are a public accommodation; (2) that the "nonprofit organization program" is a "privilege, advantage, or accommodation" of those stands; (3) and that Delaware Sportservice deprived Plaintiffs of the "full and equal enjoyment" of that privilege by removing them from the nonprofit organization program, the Court DENIES Defendants' motion to dismiss. (ECF No. 16.)

SO ORDERED.


Dated: September 30, 2025

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE